IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HAKEEM BROWN, )<br>)<br>Defendant. ) | Criminal No. 12-cr-23 GMS |

## **MEMORANDUM**

### I.   **INTRODUCTION**

On April 12, 2012, the Grand Jury for the District of Delaware indicted the defendant, Hakeem Brown ("Brown") for: (1) attempting to obstruct, delay, and affect interstate commerce and the movement of articles and commodities in such commerce by robbery, in violation of 18 U.S.C. § 1951; (2) knowing possession of a firearm in furtherance of a crime of violence for which he may be prosecuted in a court of the United States, in violation of 18 U.S.C. § 924(c)(1)(A)(i); (3) knowing possession with the intent to distribute of a mixture and substance containing a detectable amount of heroin, a Schedule I narcotic controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (4) knowing possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (D.I. 20.)

On May 20, 2012, Brown filed a Motion to Suppress Evidence, which is presently before the court. (D.I. 23.) The court held a suppression hearing on September 11, 2012, and the parties have since completed briefing on the motion. (D.I. 41.) For the reasons that follow, the

court will deny Brown's Motion to Suppress Evidence.

## II. FINDINGS OF FACT

At the September 11, 2012 evidentiary hearing, the court heard testimony from three witnesses: Officer Robert Fox of the Wilmington Police Department ("Fox"), Detective Steven Barnes of the Wilmington Police Department ("Barnes"), and Officer Michael Barrett of the Wilmington Police Department ("Barrett"). (D.I. 41.) Brown called no witnesses at the hearing. The following constitutes the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

On February 24, 2012, Fox received information from a confidential informant about a subject in possession of a handgun. (*Id.* at 6.) The informant identified the subject as "Hakeem," described his physical characteristics, and told Fox that he drove a blue sport utility vehicle with rims. (*Id.*) At Fox's request, the informant placed a monitored phone call to Hakeem from a cellular phone in the Wilmington Police Department at approximately 3:00 pm. (*Id.* at 7–8.) The call was conducted on speaker phone and monitored by Fox and another Wilmington Police detective, but it was not recorded. (*Id.* at 7.)

During the first call, the informant and Hakeem discussed an overview of a planned home invasion and the need to steal a car to commit the invasion. (*Id.* at 8.) The informant and Hakeem agreed to speak again in about an hour. (*Id.*) The informant then told Fox that they intended to steal the car to conduct surveillance of the home invasion's planned victim, a white or Hispanic male who owned a bar and was thought to keep in excess of $50,000 in cash at his home. (*Id.* at 9.) Around 3:50 pm, the informant placed a second phone call to Hakeem, during which Hakeem stated that he was in the presence of his children but would call when he was on

2

the way to meet the informant and that they were to meet in the Browntown section of Wilmington. (*Id.* at 10.)

At this point, Fox presented a picture of Brown to the informant who identified him as the "Hakeem" that he had been speaking with over the phone. (*Id.* at 11.) The police then performed a criminal history check and discovered that Brown was a convicted felon. (*Id.*)

Fox told the informant that, during the next phone conversation, he should confirm that Hakeem would be in possession of a firearm. (*Id.*) Fox advised the informant to use "street language" so as not to raise Hakeem's suspicion. (*Id.*) At 4:43 pm, the informant called Hakeem and asked him if he had his "jawn," a common street term for a handgun. (*Id.* at 12–13, 50.) Hakeem responded that he did. (*Id.* at 13.) The informant then asked if he had any gloves, and Hakeem responded that he only had one pair. (*Id.*) Hakeem then told the informant that he was on the way to meet. (*Id.*) At approximately 5:05 pm, the informant called Hakeem once again, and Hakeem stated that he was stopping to put gas in his vehicle but would be at the arranged meeting location shortly. (*Id.* at 14.) At 5:31 pm, Hakeem called the informant and told him that he was in the area. (*Id.* at 15.) The informant asked if Hakeem was "strapped," and Hakeem responded that he was. (*Id.*) Again, the term "strapped" is common street language meaning to be armed with a handgun. (*Id.*)

After the third phone call, during which Hakeem indicated that he had his "jawn," Fox began relaying information via radio to other law enforcement officers and had them move to Hakeem's planned meeting location in Browntown. (*Id.* at 13–14.) Around 5:45, those officers, including Barnes, observed a blue sport utility vehicle with rims entering the area. (*Id.* at 16, 62–

3

63.) They surrounded the vehicle, and Barnes handcuffed and removed the driver, Brown.[1] (*Id.* at 63–65, 75.)

Barnes conducted an initial patdown of Brown's waist area and then moved him away from the vehicle in order to perform a more thorough search for weapons.[2] (*Id.* at 65–68, 75.) Feeling the outside of Brown's pants, Barnes felt a soft item in the coin pocket on the right leg. (*Id.* at 67.) Suspecting that the item might be heroin, Barnes manipulated it through the material of the pants and asked Brown what it was. (*Id.*) When Brown replied that he did not know what the object was, Barnes reached into the pocket and retrieved a bundle of heroin. (*Id.*) Barnes described the bundle as follows: "It was probably six, maybe seven bags, they were small clear plastic Ziploc bags. They all contained kind [sic] like blue glassine bags inside. They were all bound together by a small black rubber band." (*Id.*) Barnes also removed a bundle of cash from Brown's left pocket, which he examined and then placed back in the pocket. (*Id.* at 68.) Brown and his vehicle were then transported separately to the Wilmington Police Department headquarters. (*Id.* at 16–17, 82–83.)

Barrett accompanied Brown on the trip back to the Wilmington Police Department, sitting in the back seat of the police car with him. (*Id.* at 82–83.) While in the car, Brown initiated a discussion with Barrett, stating "I don't do drugs. I don't sell drugs." (*Id.* at 83.) Brown also stated that he received his tax refund and bought his truck and that, "It was a nice truck, huh?" (*Id.* at 84.) Barrett then asked Brown why he had so much money and heroin in his

---

[1] Barnes actually recognized the driver as Brown because he had previously arrested Brown for possession of a firearm. (D.I. 41 at 65.)

[2] When Barnes initially removed Brown from the vehicle, it was parked next to a chain-link fence that ran alongside the road. (D.I. 41 at 65.) Because there was little room between the fence and the vehicle, Barnes moved Brown to another location to perform a more thorough search of his person. (*Id.* at 65–66.)

4

possession, and Brown responded that the money was "tax refunds" and that he was going to buy his girlfriend a car. (*Id.*) Brown then stated, "It is what it is. You all thought I was strapped." (*Id.*)

When Brown arrived at police headquarters he was processed and subjected to a strip-search. (*Id.* at 85.) During the course of that search, an additional four bags of heroin fell from the inside of his shirt, prompting Brown to note that he forgot the bags were in there. (*Id.* at 28, 85–86.) Brown was then taken to an interview room where he remained handcuffed. (*Id.* at 17–18.) Fox orally advised Brown of his right to remain silent and his right to counsel.[3] (*Id.* at 18.) When asked whether he understood, Brown replied that he did. (*Id.* at 18–19.) Fox asked whether Brown's vehicle contained any more heroin or any firearms, and Brown responded that it did not. (*Id.* at 19.) Fox then joined other law enforcement officers in the staff garage and proceeded to search Brown's vehicle. (*Id.* at 21.) No warrant was obtained prior to conducting this search. (*Id.*) The search recovered a ski mask, a .40 caliber handgun with a laser sight loaded with fifteen rounds of ammunition, and a separate magazine containing nine rounds of .40 caliber ammunition. (*Id.* at 21–22.)

Fox returned to an interview room where Brown was being held and again advised him of his *Miranda* rights. (*Id.* at 26.) Brown responded that he understood. (*Id.*) Fox questioned Brown about the firearm found in the vehicle and the heroin found on his person at the time of arrest. (*Id.* at 26–27.) Brown answered that he knew nothing about the firearm and that the heroin was for an uncle, who had a heroin addiction. (*Id.* at 27.) When questioned about the

---

[3] Specifically, Fox testified that he provided the following warnings to Brown: "I advised him that he had the right to remain silent, that anything he said can and would be used against him in a court of law, I advised him that he had the right to have an attorney present during questioning, that if he could not afford an attorney one would be appointed for him free of charge by the State of Delaware. I advised him that he didn't have to speak to me if he did not wish, and if he did choose to speak to me, he could stop at any time." (D.I. 41 at 18.)

cash, Brown responded first that he obtained it through his tax return, then that he earned the money from babysitting, and finally that he received the cash in connection with college-level courses he had been taking. (*Id.*) This concluded Fox's second interview with Brown. (*Id.*)

## III. CONCLUSIONS OF LAW

Brown seeks to suppress: (1) all evidence obtained as a result of what he claims was his illegal seizure; (2) the heroin found in his pocket at the time of arrest; (3) the firearm and ammunition found during the search of his vehicle; (4) his statements made while being transported to the police station; and (5) his statements made while being interviewed at the police station. (D.I. 23; D.I. 45 at 10.) The court addresses each disputed category of evidence in turn.

### A. Brown's Seizure

Brown first argues that "all evidence obtained as a result of his illegal seizure, which would effectively be all the evidence in this case . . . must be suppressed as a fruit of the poisonous tree." (D.I. 45 at 6.) Brown contends that, by ordering him from his vehicle and placing him in handcuffs, the law enforcement officers performed an arrest under the Fourth Amendment for which probable cause was required. (*Id.* at 5.) In his view, probable cause could not exist here, as the informant "was never used prior to this incident, was not proven reliable, nor was the information he provided verified until days after the arrest of Mr. Brown." (*Id.* at 6.) Brown also suggests that Fox's failure to record the calls between Brown and the informant reduces the value of those conversations to any probable cause calculus.[4] (*Id.*) The

---

[4] Presumably, it is Brown's position that at least portions of those phone conversations were fabricated by law enforcement in an effort to establish probable cause. The court, however, finds Fox's testimony credible on this point and, as noted above, finds that these conversations did occur as reported.

6

government maintains that probable cause to arrest Brown existed at the time he was removed from his vehicle and, in the alternative, that his detention can be characterized as merely an investigatory stop, requiring only reasonable suspicion of criminal activity. (D.I. 47 at 9–15.)

The court finds that probable cause to arrest Brown did exist at the time he was ordered from his vehicle. "Probable cause 'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). Probable cause is measured from the perspective of an objective law enforcement officer in light of the totality of the circumstances known to that officer at the time—the subjective motivations and beliefs of individual officers play no role in the Fourth Amendment analysis. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (citing *Scott v. United States*, 436 U.S. 128, 138 (1978)). In determining probable cause, the knowledge of each officer is imputed to others involved in the investigation. *See United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010); *United States v. Belle*, 593 F.2d 487, 497 n.15 (3d Cir. 1979).

Here, Fox heard Brown tell the informant that he was in possession of his "jawn" and that he was "strapped" in preparation for committing the planned robbery. Fox testified that these terms are common street terminology indicating that one is in possession of a firearm. Moreover, the informant identified the man he was speaking with as Brown when shown a photograph by police. Taken together, the officers' knowledge that Brown was a convicted felon, the informant's visual identification of "Hakeem" as Brown, Brown's statements to the

7

informant indicating that he had a handgun, his appearance at the planned meeting location, and the informant's accurate description of Brown's vehicle gave the police probable cause to arrest Brown for at least unlawful possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

B. The Narcotics Discovered on Brown's Person

Brown next argues that the heroin found in his pocket by Detective Barnes must be suppressed, as it was discovered during the course of an intrusive search in violation of *Terry v. Ohio*, 392 U.S. 1 (1968). (D.I. 45 at 7.) Under *Terry*, a law enforcement officer is permitted "to briefly detain an individual based upon 'articulable suspicion' and then to perform a limited protective 'patdown' for weapons during that detention 'where [the] officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.'" *United States v. Navedo*, 694 F.3d 463, 467 (3d Cir. 2012) (quoting *Terry*, 392 U.S. at 30). Brown suggests that Detective Barnes exceeded the scope of a proper *Terry* frisk by running his hands over the exterior of Brown's clothing three times and then by reaching into Brown's pocket. (D.I. 45 at 7.)

Brown fails to recognize, however, that the retrieval of the heroin from his pocket represents a lawful search incident to arrest. The court has already concluded that the police had probable cause to arrest Brown at the time he was ordered from his vehicle, and his seizure can therefore be viewed as a proper arrest rather than as a more limited *Terry* stop. It is a well-settled exception to the warrant requirement that "[w]hen an arrest is made . . . it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." *Chimel v. California*, 395 U.S. 752, 762–63

8

(1969). "The permissible scope of a search incident to arrest includes 'the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.'" *United States v. Shakir*, 616 F.3d 315, 317 (3d Cir. 2010) (quoting *Chimel*, 395 U.S. at 763). The Third Circuit has explained that, even when the suspect is handcuffed, such a search is permissible if "under all the circumstances, there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence." *Id.* at 321.

Although Brown was handcuffed at the time Detective Barnes reached into his pocket and retrieved the heroin, the court finds that drugs were discovered as part of a lawful search incident to arrest. Detective Barnes limited his search Brown's immediate person, an area from which even a handcuffed suspect might reasonably be expected to access weapons or evidence.

C.   The Firearm and Ammunition Discovered in Brown's Vehicle

Brown also argues that the search of his vehicle violated the Fourth Amendment. (D.I. 45 at 8.) He relies on the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332 (2009), in which the Court stated that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search." *Id.* at 351. Brown argues that, at the time his vehicle was searched, he was in police custody and unable to access the vehicle, which had been moved to police headquarters. (D>i. 45 at 8.)

Brown, however, provides an incomplete and inaccurate description of the holding in *Gant*. While that decision does state that police may search a vehicle when the arrestee is unsecured and within reaching distance of the passenger compartment, it also makes clear that a

9

vehicle search is appropriate whenever "it is reasonable to believe the vehicle contains evidence of the offense of arrest."[5] *Id.* As noted above, the police had sufficient probable cause to arrest Brown for at least possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Since it was reasonable under the circumstances to believe Brown's vehicle might contain evidence of his suspected unlawful possession, the subsequent search of the vehicle was justified under the second prong of *Gant*. *See, e.g., United States v. Seigler*, 484 F. App'x 650, at *3 (3d Cir. 2012) (noting that, even absent the controlling standing issue, seizure of guns from vehicle was permissible as a search incident to arrest "because the guns were 'relevant to the crime of arrest,' namely an illegal weapons offense" (internal citation omitted)); *United States v. Thompson*, No. 12-17, 2012 WL 6634333, at *2 (E.D. Pa. Dec. 20, 2012).

D.  Brown's Statements in Police Car

Brown also challenges the admissibility of statements made to Barrett in the police car while traveling to the Wilmington Police Department. Brown claims that these statements were made in response to questions posed by law enforcement. (D.I. 45 at 11.) Since Brown had not yet been advised of his *Miranda* rights, he argues that these answers were obtained in violation of the Fifth and Sixth Amendments and the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966). (*Id.*)

*Miranda* made clear that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384

---

[5] Brown simply omits the relevant half of the rule announced in *Gant*: "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or it is reasonable to believe the vehicle contains evidence of the offense of arrest*. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." 556 U.S. at 391 (emphasis added).

U.S. at 444. Law enforcement officers must warn a suspect in custody of his right to remain silent and of his right to an attorney before subjecting him to questioning. *United States v. Bonner*, 469 F. App'x 119, 125 (3d Cir. 2012) (citing *Berghuis v. Thompson*, 130 S. Ct. 2250, 2259 (2010)). Unless the suspect knowingly and voluntarily waives those rights, his statements are inadmissible at trial. *See id.*

While it is undisputed that Brown was not informed of his *Miranda* rights prior to making the challenged statements in the police car, there is some argument as to whether those statements were, in fact, the product of "custodial interrogation." This is significant, as not all pre-warning statements are improper:

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

384 U.S. at 478. *Miranda*'s procedural safeguards are called for only where the custodial statements obtained by police can be considered the product of interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). "Interrogation" may take the form of "either express questioning or its functional equivalent"—the touchstone inquiry is whether law enforcement should have known that their words or actions were "reasonably likely to elicit an incriminating response." *Id.* at 300–01. It is well-settled, however, that interrogation demands a "measure of compulsion above and beyond that inherent in custody itself." *Id.* Significantly, the defendant

11

bears the burden of showing that he was subject to custodial interrogation. *See United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984); *United States v. Davis*, No. 10-11, 2010 WL 2405353, at *3 (D.V.I. June 10, 2010).

Here, Barrett testified that Brown spontaneously stated, "I don't do drugs. I don't sell drugs." (D.I. 41 at 83–84.) According to Barrett, Brown also stated that he received his tax refund and bought his truck and that, "It was a nice truck, huh?"[6] (*Id.* at 84.) As suggested above, the court finds this testimony credible, and Brown has offered no independent reason to believe the statements were made in response to any questioning. The court thus concludes that the statements were not the product of express questioning by law enforcement. Likewise, the court finds that Brown was not subjected to the "functional equivalent" of express questioning. It is Brown's burden to demonstrate that he was subject to interrogation and he offers no evidence or argument that the police engaged in conduct "reasonably likely to elicit an incriminating response." Accordingly, the above statements will not be suppressed.

E. Brown's Statements in Police Station

Finally, Brown challenges the admissibility of statements made to Fox at the Wilmington Police Department headquarters. (D.I. 45 at 11.) Specifically, Brown suggests that he was never adequately advised of his *Miranda* rights and therefore was unable to provide a knowing, voluntary, and intelligent waiver of those rights before responding to law enforcement questioning. (*Id.* at 12.) In support of this contention, Brown points out that Fox failed to obtain a written waiver or record his interrogation despite ready access to pre-printed waiver forms and

---

[6] After this second statement, Barrett asked Brown why had so much money and heroin in his possession. Brown made several additional statements in response to this question, which the government concedes were the product of interrogation and does not intend to introduce at trial. As such, the court need not consider the admissibility of these later statements.

interview rooms with recording capabilities. (*Id.*) The government contends that Fox did, in fact, orally advise Brown of his *Miranda* rights. (D.I. 47 at 20.)

While police must notify a suspect of his *Miranda* rights before subjecting him to custodial interrogation, the government correctly notes that law enforcement is not required to provide such notification in written form or obtain a written waiver. *See United States v. Stuckey*, 441 F.2d 1104, 1105 (3d Cir. 1971) ("The rule . . . does not require that a waiver of rights be in writing, but only that it be voluntarily, willingly and intelligently made."). Indeed, the Supreme Court has indicated that, in providing these warnings, law enforcement need not rigidly adhere to a particular script or a precise routine. *See Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) ("We have never insisted that *Miranda* warnings be given in the exact form described in that decision."); *California v. Prysock*, 453 U.S. 355, 359 (1981) ("This Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant."); *Miranda*, 384 U.S. 436, 476 ("The warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant." (emphasis added)). As such, Fox's failure to record the interview or present Brown with a written waiver does not, in itself, present a Fifth Amendment problem.

Yet, Brown appears to suggest more broadly that no adequate warnings—whether written or oral—were ever given. (D.I. 45 at 12.) If this were the case, Brown's interrogation would present a clear violation of *Miranda*, and any statements made at the Wilmington Police Department in response to interrogation would be rendered inadmissible. The court, however, finds that Fox orally advised Brown of his rights before each interview at the police station.

13

While it is the government's burden to demonstrate that a defendant adequately waived his *Miranda* rights, *see Connecticut v. Barrett*, 479 U.S. 523, 531 (1987), Fox testified to this at the September 11, 2012 hearing, and the court finds that testimony to be credible, (D.I. 41 at 18–19, 26). Brown has neither undermined that testimony nor provided independent evidence to the contrary. Accordingly, the court finds that Brown's statements at the police station followed appropriate *Miranda* warnings and waivers and need not be suppressed.

## IV. CONCLUSION

For the foregoing reasons, the court will deny Brown's Motion to Suppress Evidence.

Dated: January ___, 2013

CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| UNITED STATES OF AMERICA, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) Criminal No. 12-cr-23 GMS |
| HAKEEM BROWN, | ) |
| Defendant. | ) |

## ORDER

At Wilmington this 6th day of January 2013, consistent with the court's memorandum issued this same date, IT IS HEREBY ORDERED THAT:

The defendant's Motion to Suppress Evidence (D.I. 23) be DENIED.

_____
CHIEF, UNITED STATES DISTRICT JUDGE